UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 18-cv-20325

v.

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

GABRIEL RAPHAEL LEAF,

Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [#20]

### I. INTRODUCTION AND FACTUAL BACKGROUND

Defendant Gabriel Raphael Leaf was indicted on May 10, 2018 for one

count of production of child pornography in violation of 18 U.S.C. § 2251(a)(1)

and one count of possession of child pornography in violation of 18 U.S.C. §

2252A(a)(5)(B). Dkt. No. 11. Defendant filed the present Motion to Suppress on

September 17, 2018. Dkt. No. 20. The government responded on October 29, 2018,

opposing the Motion. Dkt. No. 24. Defendant did not file a reply. On Friday,

February 1, 2019, this Court held an evidentiary hearing and also heard oral

argument from the parties on Defendant's Motion. During the hearing, the Court

heard testimony from Detective Matteucci, Detective Shea, Detective Nathan

Ritter, and Defendant Gabriel Leaf. The testimony from the witnesses was fairly

-1-

consistent with the recording submitted by the Government. For the reasons discussed below, this Court will deny Defendant's Motion.

Based on the testimony, the tape, and the search warrant and affidavit, the Court makes the following findings of fact: On August 31, 2017, MV-2, a fourteen-year-old male, alleges that Defendant Gabriel Leaf touched and took a photograph of his penis. MV-2 reported the incident to Detective Matteucci of the Grand Traverse County Sheriff's Office later that day. According to the evidence, MV-2 also provided Detective Matteucci with the passcode to Defendant's phone.

Detective Matteucci then prepared a warrant to seize and search Defendant's phone. Matteucci prepared an affidavit to go along with the warrant. The warrant and affidavit called for the search and seizure of any cell phone located on Defendant's person. Further, the warrant and affidavit permit the search of "[d]ata stored within cell phone or other processing and storage devices, to include applications, images, text(s), programs, encryption routines and algorithms, or other data that may be decoded, reconstituted, or otherwise manipulated to produce, utilize, transmit, receive, encrypt, encode, or display such images, text, programs, encryption routines, and algorithms." They further permitted the search of "electronic communications stored within the cell phone or other processing and storage devices . . . ." Additionally, the warrant and affidavit allowed law enforcement to compel Defendant to provide his fingerprint in order to unlock the

cell phone. Judge Thomas J. Phillips of the 38th District Court approved and signed the warranted and accompanying affidavit on August 31, 2017.

That same day, Detective Matteucci and Detective Mike Shea executed the search warrant. The Detectives travelled to Defendant's workplace at the Munson Medical Center. Defendant met with the Detectives in a room in the human resources department. Detective Matteucci served Defendant with the search warrant. According to the testimony, the room was unlocked and the Defendant was not handcuffed. However, Defendant maintains and the Court so finds that the door was closed.

Matteucci read Defendant his *Miranda* rights; Defendant initially stated that he did not want to speak to the Detectives. According to Defendant, the Detectives continued to question him and he confirmed the type of phone he owned, his phone number, and the password on his phone. Defendant also made a series of self-incriminating statements. Detectives arrested Defendant and brought him to the Grand Traverse county Jail.

The Government submitted an audio recording of the communication that Detectives Matteucci and Shea had with Defendant. The court finds that the audio recording is the best and most accurate evidence of what happened during the interview of the defendant as opposed to any contrary testimony during the hearing. On the recording, Detectives Matteucci and Shea informed Defendant that

-3-

they had a search warrant to search his phone. Defendant asked the detectives what "this is about." The detectives informed Defendant that they will get to that issue, but they first requested that Defendant activate the phone with his thumbprint. Defendant asked to read the search warrant and the Detectives provided him with a copy of the search warrant, without the affidavit.

Detective Matteucci then read Defendant his *Miranda* rights and asked Defendant if he was willing to talk to him. Defendant stated, "I'm not." Matteucci asked Defendant if he knew what "this" was about, and Defendant stated that he did not. Matteucci then stated that he and Detective Shea were going to fill out the search warrant and told Defendant that he would not get his phone back that day. Defendant then asked what "this" was about. Detective Matteucci stated, "well, you don't want to talk to me about that, if you want to talk to me about it, we can explain it and go through, so." Defendant replied, "I would like to just be informed about what is going on." The detectives proceeded to fill out the search warrant and asked Defendant for the passcode to Defendant's phone. Defendant stated something inaudible[1] to which Detective Matteucci replied, "well, um, I would like

---

[1] From this Court's review of the audio, Defendant said, "does that mean we can." Irrespective of Defendant's actual words, Defendant's statement had the effect of asking the detectives if they could discuss the matter. Defendant's exact statement to Detectives was immaterial to this Court's analysis of the audio recording because Defendant clearly asked the detectives what the investigation was about another 2–3 times after invoking *Miranda*. *See infra* Section II.2.

to discuss it with you." Defendant then stated, "I would like to know why."

Defendant also asked if he was being accused of something.

Detective Matteucci then informed Defendant that it was about something

that occurred at MV-2's home. Matteucci asked Defendant if he knew what "this"

was about, and Defendant stated that he did not. Matteucci asked Defendant, "do

you want to talk about it further?" Defendant responded, "I'm still not really sure

what's being talked about." Detective Matteucci then asked Defendant about his

relationship with MV-2. Defendant responded to Matteucci's question and

continued to communicate with Matteucci, making self-incriminating statements.

Detective Matteucci then left the room to speak to a prosecutor. The

prosecutor advised Matteucci to take Defendant into custody. At this point,

Matteucci arrested Defendant. Law enforcement then searched Defendant's phone

and uncovered an image of MV-2's penis, taken on August 31, 2017. Law

enforcement also discovered eight photos of another minor male's penis on

Defendant's phone, taken on August 26, 2015.

## II. DISCUSSION

1. Validity of Search Warrant

   a. Specificity of the Search Warrant

Defendant concedes that the facts in the search warrant affidavit support a request to search his phone and seize any photo of MV-2 or his penis which was created on August 31, 2017. Dkt. No. 20-1, pg. 2 (Pg. ID 68). However, Defendant asserts that the entire search warrant is invalid because the search warrant does not describe what specific content was to be searched for on his phone or what crime officers are permitted to search for evidence of. Dkt. No. 20-1, pg. 3 (Pg. ID 69). the Government argues that the search warrant incorporates the affidavit. Dkt. No. 24, pg. 7 (Pg. ID 100). Therefore, the Government argues that the warrant is sufficiently particular because the warrant and affidavit, together, are adequate.

To be valid, a search warrant must be sufficiently particular. *See United States v. Perez*, 629 F. App'x 699, 703 (6th Cir. 2015); *see also United States v. Castro*, 881 F.3d 961, 964 (6th Cir. 2018) ("[t]he Fourth Amendment demands that a search warrant particularly describ[e] the places law enforcement may search and the things they may seize.") (internal quotations omitted). "At an 'irreducible

minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized.'" *United States v. Sissler*, 966 F.2d 1455 (6th Cir. 1992) (quoting *United States v. Leary*, 846 F.2d 592, 602 (10th Cir. 1988)).

Further, the warrant itself must be sufficiently particular, and not solely the supporting documents. *Perez*, 629 F. App'x at 703. However, the Fourth Amendment allows a warrant to incorporate the content of other documents by reference. *Id.* In order to use an affidavit or supporting document, the warrant must incorporate the affidavit by reference and the affidavit must be attached to the warrant. *Id.*

"A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018). In *Castro*, the government's search warrants noted that they were based on "probable cause to believe that evidence of violations of Texas Penal Code 29.03 would be found on the phones." *Id.* However, Defendant argued that the warrants lacked particularity because the warrants permitted searches for evidence of "a crime," which could mean "any crime." *Id.* at 964. The warrant also allowed the search of "any other files, deleted or not[,] involved in this or any other unlawful activities." *Id.* at 965.

The *Castro* court found that the language in the warrant that cited the Texas

Penal Code served as a "global modifier" that limited the scope of the warrant to

evidence of aggravated burglary. *Id.*  It held that the warrant was sufficiently

particular because "[r]ead as a whole, the warrants told officers they could search

only for evidence related to aggravated burglary." *Id.*

In *Andresen v. Maryland*, the United States Supreme Court found a warrant

sufficiently particular where it permitted the seizure of "fruits, instrumentalities[,]

and evidence of crime at this (time) unknown." 427 U.S. 463, 479 (1976). The

Court found that the challenged phrase had to be read as only authorizing the

search and seizure of evidence relating to "the crime of false pretenses with respect

to Lot 13T," as also stated in the warrant. *Id.* at 481.

The Sixth Circuit has previously held that a warrant was sufficiently

particular where it permitted the search of "any contraband, fruits of the crime,

[i]nstrumentalities (sic) used in commission of a crime or items of evidentiary

value[]." *United States v. Mitchum*, 208 F.3d 216 (6th Cir. 2000). Earlier language

in the warrant permitted the search of items "used to forge, counterfeit, or

manufacture forged written instrument," and "monies or valuables derived from

[the] illegal forgery operation." *Id.* The court noted the *Andresen* court's holding

and reasoned that in context, the phrase allowing officers to seize "any contraband,

fruits of the crime, [i]nstrumentalities used in commission of a crime or items of

evidentiary value[]" did not provide unbounded discretion to officers to seize evidence regarding any crime. *Id.*

Here, the parties do not dispute that the affidavit establishes probable cause that the Defendant committed a child pornography crime. *See id.*; Dkt. No. 20-1, pg. 2 (Pg. ID 68). Additionally, the parties do not dispute that the affidavit describes the cell phone and data to be searched in order to find evidence of a child pornography crime. *See id.*

The affidavit and warrant in this case states that the thing to be searched is "[t]he cell phone, Sim card, and SD card belonging to [Defendant]." Dkt. No. 25-2, pg. 1, 4 (Pg. ID 150, 153). The affidavit and warrant also allow officers to search Defendant's person in order to obtain the phone. *See id.* The warrant and affidavit then further states that the search may include "[d]ata stored within cell phone or other processing and storage devices, to include applications, images, text(s), programs, encryption routines and algorithms, or other data that may be decoded, reconstituted, or otherwise manipulated to produce, utilize, transmit, receive, encrypt, encode, or display such images, text, programs, encryption routines, and algorithms." *Id.* They further authorized the search of "electronic communications stored within the cell phone or other processing and storage devices . . . ." *Id.*

Further, the affidavit states the facts which establish probable cause. Dkt. No. 25-2, pg. 2 (Pg. ID 151). It states that on August 31, 2017, MV-2 woke up to

discover Defendant touching his penis and taking a picture of his genitalia. *Id.* The affidavit also identifies Defendant's cell phone number. *Id.*

The search warrant and affidavit establish probable cause and are sufficiently particular under the Fourth Amendment. First, the search warrant incorporates the affidavit. The search warrant includes the first page of the affidavit within it. *Compare* Dkt. No. 25-2, pg. 1 (Pg. ID 150) *with* Dkt. No. 25-2, pg. 4 (Pg. ID 153). Further, the affidavit was attached to the search warrant. *See* Dkt. No. 25-2, pg. 5 (Pg. ID 154). Both the search warrant and affidavit state that Defendant's phone was the object to be searched. Dkt. No. 25-2, pg. 1, 4 (Pg. ID 150, 153).

In addition, the affidavit states what crime Defendant is alleged to have committed—child pornography. *See* Dkt. No. 25-2, pg. 2 (Pg. ID 151) (stating that Defendant allegedly took a photograph of MV-2's penis). The affidavit also states specifically what illegal content was alleged to be on Defendant's phone. *See id.* (noting that Defendant took the illicit photograph of MV-2 on August 31, 2017). The contents of the search warrant and affidavit therefore made it clear that police officers were permitted to search the contents of Defendant's phone for a photograph of MV-2 which was taken on August 31, 2017. This is in compliance with the standard set forth in *Castro*. 881 F.3d 961, 964 (6th Cir. 2018) (stating

that "[t]he Fourth Amendment demands that a search warrant particularly describ[e] the places law enforcement may search and the things they may seize.").

Additionally, the sufficiency of the warrant is not undermined by the general language also included in the warrant. This is consistent with the conclusions reached by the *Mitchum* and *Andresen* courts.

For the reasons discussed above, this Court concludes that the search warrant is sufficiently particular under the Fourth Amendment.

### b.  Validity of Provision to Compel Defendant's Fingerprint

Next, Defendant argues that the provision of the search warrant that allows officers to compel Defendant's fingerprint violates the Fourth Amendment. Dkt. No. 20-1, pg. 11 (Pg. ID 77). The Government responds that the government had obtained the password to Defendant's phone prior to executing the search warrant. Dkt. No. 24, pg. 11 (Pg. ID 104). Therefore, the inevitable discovery doctrine would prevent preclusion of any evidence discovered on Defendant's phone. *See id.*

The inevitable discovery doctrine provides that evidence obtained unlawfully is admissible if the government can show that the evidence "ultimately or inevitably would have been discovered by lawful means." *United States v.*

*Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013) (quoting *Nix v. Williams*, 467 U.S. 432, 444 (1984).

Here, the Government had two methods in which it would have been able to access the contents of Defendant's phone without compelling Defendant to use his fingerprint to unlock it. First, the Government had obtained the password to Defendant's phone from MV-2. Dkt. No. 24, pg. 3 (Pg. ID 96). Second, the Government could have used forensic examination tools to access the contents of Defendant's phone. *Id.* at pg. 12 (Pg. ID 105). Consequently, even if the provision in the search warrant that compels Defendant's fingerprint was invalid, the evidence the government obtained is admissible by way of the inevitable discovery doctrine.

Defendant also argues that the provision of the warrant compelling his fingerprint violates the Fifth Amendment prohibition against self-incrimination. Dkt. No. 20-1, pg. 6 (Pg. ID 72).

In *Schmerber v. California*, the Supreme Court noted that federal and state courts typically hold that the Fifth Amendment does not protect against compulsion to submit to fingerprinting, photographing, or measurements, among other things. 384 U.S. 757, 764 (1963). This Court has noted the same. *See United States v. Nixon*, No. 15-cr-20020, 2015 WL 4430176, at *2 (E.D. Mich. July 20,

2015)(Drain, J.) (noting that "the Fifth Amendment's protection against self-incrimination does not extend to physical characteristics such as giving a blood sample or handwriting exemplar."). As courts have noted, compulsion of a fingerprint does not violate the Fifth Amendment. This Court will hold the same.

To conclude, it is unnecessary for this Court to decide whether the provision in the Government's search warrant compelling Defendant's fingerprint is valid under the Fourth Amendment. The inevitable discovery doctrine manifestly renders the evidence seized from Defendant's phone valid. The provision likewise does not violate the Fifth Amendment prohibition against self-incrimination because a fingerprint does not constitute testimonial communication. For these reasons, this Court holds that the provision in the Government's search warrant that compels Defendant's fingerprint is valid.

2. *Miranda*

Lastly, Defendant argues that officers questioned him in violation of *Miranda*. Dkt. No. 20-1, pg. 15 (Pg. ID 81). The Government asserts that no custodial interrogation occurred, and the Court agrees. Even though the Defendant was contacted at his place of employment for the purpose of serving a search warrant on him for his phone, the mere fact that discussion about the warrant occurred in an office with the door closed did not amount to custodial

-13-

interrogation. Defendant was not initially arrested, handcuffed, nor told he was not free to leave. Therefore, the Court finds there was no custodial interrogation.

Alternatively, the Government contends that Defendant waived his *Miranda* rights by re-initiating communication with officers after he stated that he did not want to speak with them. Again, the Court so finds. The Defendant's curiosity about the basis and source of the allegations led him to ask numerous questions about the nature and substance of the charges made against him. This reengagement seeking details of the claim led to a waiver of his right to remain silent. Moreover, at no point after the conversation began did the Defendant reassert his right to remain silent.

Under the Fifth Amendment, "suspects cannot be subjected to a custodial interrogation until they have been advised of their rights." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). *Miranda* warnings are only required for "custodial interrogations." *Id.* Thus, a suspect must be "taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest" for *Miranda* to apply. *Id.* Courts have considered the following factors when determining if an individual was in custody under *Miranda*:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning;

and (4) other indicia of custody such as whether the suspect was
informed at the time that the questioning was voluntary or that the
suspect was free to leave or to request the officers to do so; whether
the suspect possessed unrestrained freedom of movement during
questioning; and whether the suspect initiated contact with the police
or voluntarily admitted the officers to the residence and acquiesced to
their requests to answer some questions.

*Id.* at 950. Here, officers were questioning Defendant about his possible

involvement in a crime. Officers questioned Defendant in a room in the human

resources department at Defendant's workplace. Defendant was not handcuffed

during the questioning.

The Government submitted audio of its questioning of Defendant to the

Court. The audio questioning submitted by the Government lasted for

approximately one hour. On the audio, Detective Matteucci told Defendant that

they (Detectives Matteucci and Shea) had a warrant to search his phone and

asked Defendant to activate his phone with his thumbprint. Defendant asked

what "this is regarding." Detective Matteucci then gave Defendant a copy of the

search warrant and affidavit and read Defendant his *Miranda* rights. Defendant

said that he was not willing to talk to the police. Detective Matteucci then told

Defendant that they were detectives with the Sheriff's Department and that they

would fill out the search warrant and that Defendant would not get his phone

back that day. Defendant again asked what "this" was about. Detective

Matteucci stated that Defendant did not want to talk to him so he would not

-15-

discuss it but if Defendant wanted to talk about it he would explain it to him. Defendant stated that he would like to be informed about what was going on. Detective Shea proceeded to ask Defendant questions about his phone, including the phone number for the phone and the passcode.

Detective Matteucci then stated that he would like to discuss the situation with Defendant. Defendant responded that he would like to know why the detectives were there. Detective Matteucci then told Defendant that there are two sides to every story and they wanted to give Defendant a chance to give his side of the story. Matteucci then told Defendant that they were there concerning something that happened at MV-2's home. Matteuucci asked Defendant if he wanted to talk to them about the matter further. Defendant stated that he still did not know what was being talked about.

Detective Matteucci proceeded to communicate with Defendant about his relationship with MV-2's family and the events of the previous night, and the Defendant answered all questions posed to him concerning those topics. Matteucci then told Defendant about the allegation that MV-2 had made against him. Defendant proceeded to make several self-incriminating statements relating to MV-2's accusation. Defendant also stated that he had other photos of a minor's penis on his phone. Detective Matteucci then stepped out of the room

for several minutes to speak to the prosecutor. Matteucci came back and placed Defendant under arrest.

Considering the four factors outlined above, the Court finds that law enforcement did not subject Defendant to custodial interrogation. Defendant spoke with the detectives in an unlocked human resources room at his workplace and was not in handcuffs. The questioning lasted no more than one hour. Lastly, Defendant voluntarily agreed to be questioned by the officers after stating that he was not willing to speak with them. The audio submitted by the Government does not display any coercion or threats by the detectives in order to force Defendant to communicate with them.

However, even if Defendant was subjected to custodial interrogation, he waived his *Miranda* rights by re-initiating communication with detectives after stating that he did not want to talk to them. In *Oregon v. Bradshaw*, the Supreme Court held that the defendant reinitiated communication with police officers after invoking his rights under *Miranda*. 462 U.S. 1039, 1045 (1983).

In *Bradshaw*, the defendant invoked his right to an attorney. *Id.* at 1041–42. Minutes later, the defendant asked the police officer, "what is going to happen to me now?" *Id.* at 1042. The officer reminded the defendant that he requested an attorney and that he did not have to talk. *Id.* The defendant stated that he

understood and he continued to talk to the police officer about the investigation against him. *Id.*

The *Bradshaw* Court reasoned that a "suspect himself [must] initiate[] dialogue with the authorities" in order to waive any *Miranda* rights previously invoked. *Id.* at 1044. The Court then noted that the defendant asked "what is going to happen to me now" before police officers subjected him to interrogation. *Id.* at 1044. The Court also noted that the police told the defendant that he did not have to talk, and the defendant stated that he understood. *Id.* at 1046. The Court held that there was "no doubt" that the defendant's inquiry initiated further conversation because the defendant's question "evinced a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045–46. The Court also observed that defendant's statement could be reasonably interpreted by a police officer as relating generally to the investigation. Further, the Court agreed with the conclusions of the state court below that the police did not threaten, induce, or make promises to the defendant if he talked, and that the defendant understood his rights and changed his mind within a short time after requesting an attorney. *Id.* at 1046.

*Bradshaw* is similar to this case in several respects. Here, the Defendant stated that he did not want to talk after Detective Matteucci advised him of his *Miranda* rights. This is like the Defendant in *Bradshaw* who requested an

-18-

attorney after the police advised him of his *Miranda* rights. A few minutes later, similar to *Bradshaw*, Defendant suggested a resumption of the discussion with the officers by asking what "this" was about. Defendant also stated, "I would like to just be informed about what is going on," and "I would like to know why." Defendant's inquiries "could reasonably have been interpreted by the officer as relating generally to the investigation." *Bradshaw*, 462 U.S. at 1046. Similar to *Bradshaw,* Detective Matteucci's actions suggested that he viewed Defendant's inquiries in this manner. Detective Matteucci asked Defendant if he wanted to "talk about it further" and Defendant proceeded to discuss the investigation with Matteucci. *See id.*

Defendant asked the detectives why they were there 2–3 times after invoking his *Miranda* rights and before Detective Matteucci began to question him. This indicates Defendant's desire and willingness to talk with the detectives about the investigation. Similar to *Bradshaw*, the police did not threaten or induce Defendant to talk. Detective Matteucci reminded Defendant that he stated he did not want to talk to them, and Defendant proceeded to discuss the investigation. Accordingly, this Court rejects Defendant's argument that he did not waive his *Miranda* rights.

To conclude, this Court finds that Detectives Matteucci and Shea did not subject Defendant to custodial interrogation. Further, even if Defendant was in

custody, he waived his *Miranda* rights by initiating communication with the detectives after he stated that he was not willing to talk. For these reasons, the Court finds that the Government did not violate *Miranda*, and it will deny the Motion to Suppress.

### III. CONCLUSION

For the reasons discussed herein, the Court will deny all parts of the Defendant's Motion to suppress the evidence and the statements of the Defendant.

SO ORDERED.


Dated:        February 19, 2019

s/Gershwin A. Drain
Hon. Gershwin A. Drain
United States District Court Judge




CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 19, 2019, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager